# United States District Court

NORTHERN DISTRICT OF GEORGIA

**ORIGINAL**

UNITED STATES OF AMERICA
v.

JERRY B. MANNERY, JR.

**CRIMINAL COMPLAINT**

CASE NUMBER: 1:13-MJ-183

FILED IN CHAMBERS
FEB 11 2013
U.S. MAGISTRATE JUDGE
N.D. GEORGIA

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.

Beginning in or about April 2012 and continuing through February 2013, in DeKalb County and elsewhere in the Northern District of Georgia, the defendant did,

conspire to obstruct and affect commerce by unlawfully obtaining United States currency from another person, with the consent of that person, said consent having been induced under color of official right and attempt to possess with intent to distribute cocaine, a Schedule II controlled substance

in violation of Title 18, United States Code, Section 1951 and Title 21, United States Code, Section 841.

I further state that I am a agent of the Federal Bureau of Investigation (FBI) and that this complaint is based on the following facts:

See Attached Affidavit

Continued on the attached sheet and made a part hereof.        (X) Yes ( ) No

Signature of Complainant
James P. Hosty, IV

Based upon this complaint, this Court finds that there is probable cause to believe that an offense has been committed and that the defendant has committed it. Sworn to before me, and subscribed in my presence

February 11, 2013                                    at    Atlanta, Georgia
Date                                                       City and State

Alan J. Baverman
United States Magistrate Judge
Name and Title of Judicial Officer                          Signature of Judicial Officer
AUSA Brent A. Gray

## AFFIDAVIT IN SUPPORT OF ARREST WARRANT
## FOR JERRY B. MANNERY, JR.

I, James P. Hosty, IV, being duly sworn, depose and state the following:

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed for approximately 7 years. I am currently assigned to the Atlanta, Georgia office and work on the Civil Rights/Human Trafficking/Public Corruption Squad, which has the responsibility for investigating police corruption, among other federal crimes. I am a law enforcement officer of the United States, FBI, U.S. Department of Justice, within the meaning of Title 18, United States Code, Section 3052, which includes being an officer of the United States who is empowered by law to conduct investigations and make arrests for offenses pursuant to Title 18, United States Code, Section 3052.

2. During my law enforcement career, I have participated in dozens of investigations relating to drug trafficking and police corruption. I have received specialized training in the methods and techniques used by drug trafficking organizations. I have debriefed many witnesses and confidential informants about drug trafficking generally, as well as the specific practice of employing corrupt law enforcement officers as part of a drug trafficking scheme. Through this training and experience, I have become familiar with many of the patterns of activity exhibited by drug traffickers. Except where I state that I am relying on my training and experience as described here, the information in this affidavit is based on information and belief, the source of that information and basis for that belief being my own investigation and information obtained by other law enforcement agents.

3. I submit this affidavit in support of an arrest warrant for JERRY B. MANNERY, JR. for conspiring to commit extortion under color of official right in violation of Title 18, United States

Code, Section 1951, and attempted possession with the intent to distribute cocaine in violation of Title 21, United States Code, Section 841.

## BACKGROUND OF INVESTIGATION

4. Based on my training and experience, I know that sophisticated drug trafficking groups distribute narcotics using a variety of covert methods that are designed to avoid detection by law enforcement and others. If detected, they are aware law enforcement will seize the drugs and money and arrest them. They also know that other drug dealers or criminal groups will rob them, if given a chance, stealing both the drugs and money. In the worst case, drug deals can turn violent.

5. Given these risks, drug traffickers occasionally attempt to enlist law enforcement officers to provide protection both for them and the drug transactions they conduct. In employing corrupt police officers at a drug deal, the traffickers hope to prevent rival groups from intervening and ultimately stealing their drugs and the drug proceeds. Additionally, they hope to keep legitimate law enforcement at bay by positioning a visible law enforcement presence at or near the drug transactions. In these cases, drug traffickers are willing to pay thousands of dollars to corrupt law enforcement officers who will provide protection for these transactions.

6. In August, 2011, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) was investigating a street gang in the Metro Atlanta area. During the course of that investigation, a confidential informant (CI-1) provided information about the gang's criminal activities. CI-1 told federal agents that police officers were involved in protecting the gang's activities, including their drug trafficking crimes. In general, these police officers, in uniform, driving police vehicles or otherwise displaying indicia of their positions, protected the drug dealers from being detected or arrested by other law enforcement officers and from being robbed by other drug dealers. The

information provided to federal agents by CI-1 regarding the use of law enforcement officers to protect drug deals is consistent with my experience and training in the investigation of similar cases.

7.   CI-1, who had been working with federal agents since August, 2011, communicated to gang members and their associates that CI-1 would need police protection for his/her upcoming drug transactions. Shortly thereafter, Shannon Bass, Jerry B. Mannery, Jr., and Elizabeth Coss, none of whom are law enforcement officers, began identifying to CI-1 law enforcement officers interested in protecting his/her drug deals. Once those individuals were identified, information regarding the location and circumstances of the proposed drug deals was relayed to CI-1 and/or Shannon Bass, Jerry B. Mannery, Jr., Elizabeth Coss for him/her to pass along to law enforcement officers who expressed an interest in protecting the drug transactions.

## FACTS ESTABLISHING PROBABLE CAUSE

8.   On ten separate occasions beginning in or around April, 2012 and continuing until in and around February, 2013, JERRY B. MANNERY, JR. provided protection for what he believed to be drug transactions involving multiple kilograms of cocaine.

9.   <u>Conversation on April 9, 2012.</u>   On April 9, 2012, a confidential informant (CI-1) had a conversation with JERRY B. MANNERY, JR.. During that conversation, JERRY B. MANNERY, JR. said that he knew of three police officers who were interested in protecting drug transactions in exchange for payment. JERRY B. MANNERY, JR. agreed to arrange for these officers to be present at CI-1's future drug transactions.

10.   <u>Drug Transaction on April 13, 2012</u>.   On April 13, 2012, FBI and ATF agents surveilled a drug transaction between JERRY B. MANNERY, JR., Stone Mountain Police Department (SMPD) Officer Denoris Carter and two confidential informants (CI-1 and CI-2) in a parking lot located at the intersection of Fourth Street and Manor Drive, Stone Mountain, Georgia.

When CI-1 arrived in the parking lot, the agents observed Carter, in his police uniform, driving a Stone Mountain Police Department (SMPD) patrol vehicle parked nearby. Agents also observed JERRY B. MANNERY, JR. parked nearby. Shortly thereafter, CI-2 arrived and parked near CI-1. CI-1 got in CI-2's vehicle with a backpack containing three kilograms of counterfeit cocaine. CI-1 handed the backpack containing the counterfeit cocaine to CI-2. In exchange, CI-2 handed CI-1 a backpack containing $4,000. During this drug transaction, agents observed Carter in his SMPD vehicle; he appeared to be watching the drug transaction. After this drug transaction was completed, CI-1 drove to JERRY B. MANNERY, JR.'s vehicle. CI-1 got in JERRY B. MANNERY, JR.'s vehicle and they left the area. During a short drive, CI-1 provided JERRY B. MANNERY, JR. with the payment of $4,000 which was to be shared with Carter. JERRY B. MANNERY, JR. then returned CI-1 to the parking lot. These transactions were audio and video recorded.

11. <u>Drug Transaction on April 20, 2012</u>. On April 20, 2012, FBI and ATF agents surveilled a drug transaction between JERRY B. MANNERY, JR., Carter, CI-1 and CI-2 in a parking lot located at the intersection of Fourth Street and Manor Drive, Stone Mountain, Georgia. When CI-1 arrived in the parking lot, the agents observed Carter, in his police uniform, driving a SMPD patrol vehicle parked nearby. Agents also observed JERRY B. MANNERY, JR. parked nearby. Shortly thereafter, CI-2 arrived and parked near CI-1. CI-1 got in CI-2's vehicle with a backpack containing three kilograms of counterfeit cocaine. CI-1 handed the backpack containing the counterfeit cocaine to CI-2. In exchange, CI-2 handed CI-1 a backpack containing $4,000. During this drug transaction, agents observed Carter driving his SMPD patrol vehicle slowly through the parking lot. After this drug transaction was completed, CI-1 drove next to JERRY B. MANNERY, JR.'s vehicle. CI-1 got in JERRY B. MANNERY, JR.'s vehicle and provided JERRY

B. MANNERY, JR. with the payment of $4,000 which was to be shared with Carter. These transactions were audio and video recorded.

12. <u>Meeting on April 24, 2012.</u> On April 24, 2012, FBI and ATF agents surveilled a meeting at an Applebee's restaurant, 4705 Memorial Drive, Decatur, Georgia, between JERRY B. MANNERY, JR., Carter and CI-1. During this meeting, the group discussed operational aspects of the April, 2012 drug transactions. CI-1 confirmed that JERRY B. MANNERY, JR. paid Carter for his participation in the drug transactions. In addition, Carter agreed to follow CI-1 from the next drug transaction which JERRY B. MANNERY, JR. and Carter were told would involve ten kilograms of cocaine. This meeting was audio recorded.

13. <u>Drug Transaction on April 27, 2012.</u> On April 27, 2012, FBI and ATF agents surveilled a drug transaction between JERRY B. MANNERY, JR., Carter, CI-1 and CI-2 in a parking lot located at the intersection of Fourth Street and Manor Drive, Stone Mountain, Georgia. When CI-1 arrived in the parking lot, the agents observed Carter, in his police uniform, driving a SMPD patrol vehicle parked nearby. Agents also observed JERRY B. MANNERY, JR. parked nearby. Shortly thereafter, CI-2 arrived and parked near CI-1. CI-1 got in CI-2's vehicle. Once inside CI-2's vehicle, CI-2 handed CI-1 two backpacks containing a total of ten kilograms of counterfeit cocaine. In exchange, CI-1 gave CI-2 a backpack which was stuffed to appear to contain a large quantity of cash. CI-1 then got out of CI-2's vehicle and placed the backpacks containing the ten kilograms of counterfeit cocaine onto the backseat of CI-1's vehicle. CI-1 left and was closely followed by Carter driving his SMPD patrol vehicle. Carter followed CI-1 until he reached U.S. Highway 78. CI-1 then met with JERRY B. MANNERY, JR. at Quick Trip, 1910 Lawrenceville Highway, Decatur, Georgia. During that meeting, CI-1 gave JERRY B. MANNERY, JR. a $6,000 payment which was to be shared with Carter. These transactions were audio and video recorded.

14. <u>Meeting on May 2, 2012.</u> On May 2, 2012, FBI agents surveilled a meeting at an Applebee's restaurant, 4705 Memorial Drive, Decatur, Georgia, between JERRY B. MANNERY, JR., Carter and CI-1. During this meeting, the group discussed operational aspects of the April 27, 2012 drug transaction. Carter asked CI-1 if he/she was satisfied with the manner in which Carter followed CI-1 from the April 27, 2012 drug transaction. CI-1 then paid Carter and JERRY B. MANNERY, JR. $500 each and told them that it was a bonus for protecting CI-1 during the previous deals. This meeting was audio and video recorded.

15. <u>Drug Transaction on May 4, 2012.</u> On May 4, 2012, FBI and ATF agents surveilled a drug transaction between JERRY B. MANNERY, JR., Carter, CI-1 and CI-2 in a parking lot located at the intersection of Fourth Street and Manor Drive, Stone Mountain, Georgia. When CI-1 arrived in the parking lot, the agents observed Carter, in his police uniform, driving a SMPD patrol vehicle parked nearby. Agents also observed JERRY B. MANNERY, JR. parked nearby. Shortly thereafter, CI-2 arrived and parked near CI-1. CI-1 got into CI-2's vehicle with a backpack containing eight kilograms of counterfeit cocaine. Once inside CI-2's vehicle, CI-1 handed CI-2 the backpack containing the counterfeit cocaine. In exchange, CI-2 gave CI-1 a backpack which contained $4,000. During this drug transaction, agents observed Carter driving his SMPD patrol vehicle slowly through the parking lot and parking in various locations near the drug transaction. After this drug transaction was completed, CI-1 drove next to JERRY B. MANNERY, JR.'s vehicle. CI-1 got in JERRY B. MANNERY, JR.'s vehicle and provided JERRY B. MANNERY, JR. with the payment of $4,000 which was to be shared with Carter. These transactions were audio and video recorded.

16. <u>Drug Transaction on September 20, 2012.</u> On September 20, 2012, FBI agents surveilled a drug transaction between JERRY B. MANNERY, JR., Shannon Bass, Carter and UC-1

at Bev's Place restaurant, 1054 Main Street, No. C, Stone Mountain, Georgia. When Bass arrived in the restaurant parking lot, the agents observed Carter, wearing his police uniform and a firearm in a holster on his belt, standing near his SMPD patrol vehicle. Agents also observed JERRY B. MANNERY, JR. parked nearby. Shortly thereafter, UC-1 arrived and parked near Bass. Bass got into UC-1's vehicle with a backpack containing two kilograms of counterfeit cocaine. Once inside UC-1's vehicle, Bass handed UC-1 the backpack containing the counterfeit cocaine. In exchange, UC-1 gave Bass a backpack which contained $5,000. During this drug transaction, agents observed Carter walking slowly through the parking lot; he appeared to be watching the drug transaction. After this drug transaction was completed, Bass drove to a Kroger store, 965 North Hairston Road, Stone Mountain, Georgia, and met with JERRY B. MANNERY, JR.. There, Bass got in JERRY B. MANNERY, JR.'s vehicle and provided JERRY B. MANNERY, JR. with the payment of $5,000 which was to be shared with Carter. A short time later, agents observed JERRY B. MANNERY, JR. meet with Carter at the United States Post Office, 5181 West Stone Mountain Street, Stone Mountain, Georgia. These transactions were audio and video recorded.

17.     Meeting on November 18, 2012. On November 18, 2012, FBI agents surveilled a meeting at a Waffle House restaurant, 8060 Rockbridge Road, Lithonia, Georgia, between JERRY B. MANNERY, JR., Sharon Peters and Bass. During this meeting, JERRY B. MANNERY, JR. introduced Peters, a security employee of Paragon Systems, Inc., to Bass. According JERRY B. MANNERY, JR., Peters was a federal agent who was interested in providing protection to drug dealers in exchange for payment. Bass told JERRY B. MANNERY, JR. and Peters that he planned to "move three blocks" in a future drug transaction. Bass asked JERRY B. MANNERY, JR. and Peters to protect that transaction and Bass provided mobile telephones that were to be used by them during the drug transaction. This meeting was audio recorded.

18. <u>Drug Transaction on November 19, 2012.</u> On November 19, 2012, FBI agents surveilled a meeting between JERRY B. MANNERY, JR., Peters, Bass and a confidential informant (CI-2) in the parking lot of a Marriott Hotel, 200 Interstate North Parkway, Atlanta, Georgia. Bass arrived at the hotel parking lot and was followed shortly by CI-2 who parked next to Bass. CI-2 got out of his/her vehicle carrying a backpack and got into Bass's vehicle. At that point, Peters, who had just telephoned Bass and said that she "had her Glock," was parked near Bass's vehicle and appeared to be watching Bass's vehicle. JERRY B. MANNERY, JR. was also parked nearby and appeared to be watching Bass's vehicle. Inside Bass's vehicle, Bass provided CI-2 a backpack containing three kilograms of counterfeit cocaine. In exchange, CI-2 gave Bass a backpack containing $7,000. CI-2 got out of Bass's vehicle with the backpack containing the counterfeit cocaine and left the parking lot. Then, Bass drove to a BP gas station, 2779 Windy Hill Road, Marietta, Georgia. At the BP station, Bass met JERRY B. MANNERY, JR. and gave JERRY B. MANNERY, JR. the $7,000 payment. JERRY B. MANNERY, JR. told Bass that he would provide Peters with "her cut" of the payment. Immediately thereafter, FBI agents observed JERRY B. MANNERY, JR. meet with Peters at a McDonald's restaurant, 2700 Windy Hill Road, Marietta, Georgia. These transactions were video recorded.

19. <u>Meeting on November 27, 2012.</u> On November 27, 2012, FBI agents surveilled a meeting at a Waffle House restaurant, 8060 Rockbridge Road, Lithonia, Georgia, between JERRY B. MANNERY, JR., Peters and Bass. During this meeting, the group discussed the logistics of a future drug transaction involving the delivery of three kilograms of cocaine and critiqued the November 19, 2012 drug transaction. This meeting was audio and video recorded.

20. <u>Drug Transaction on November 29, 2012.</u> On November 29, 2012, FBI agents surveilled a meeting between JERRY B. MANNERY, JR., Peters, Bass and a confidential informant

(CI-6) in the parking lot of a Costco store, 500 Brookhaven Avenue, Atlanta, Georgia. Bass arrived at the store parking lot and was followed shortly by CI-6 who parked next to Bass. CI-6 got out of his/her vehicle carrying a backpack and got into Bass's vehicle. At that point, Peters, who had just told Bass that she was carrying a firearm, was parked near Bass's vehicle and appeared to be watching Bass's vehicle. JERRY B. MANNERY, JR. was also parked nearby and appeared to be watching Bass's vehicle. Inside Bass's vehicle, Bass provided CI-6 a backpack containing three kilograms of counterfeit cocaine. In exchange, CI-6 gave Bass a backpack containing $7,000. CI-6 got out of Bass's vehicle with the backpack containing the counterfeit cocaine and left the parking lot. Then, Bass drove to a Quick Trip, 5347 Peachtree Industrial Boulevard, Atlanta, Georgia. At the Quick Trip, Bass met JERRY B. MANNERY, JR. and gave JERRY B. MANNERY, JR. the $7,000 payment. Bass then left the Quick Trip. JERRY B. MANNERY, JR. remained at the Quick Trip. Shortly thereafter, FBI agents observed Peters arrive and meet with JERRY B. MANNERY, JR.. These transactions were audio and video recorded.

21. <u>Conversations between January 10, 2013 and January 22, 2013</u>. On or between January 10, 2013 and January 22, 2013, JERRY B. MANNERY, JR. informed Bass that a DeKalb County Police Department (DCPD) officer, later identified as Dorian Williams, was interested in protecting a drug transaction for Bass in exchange for a $6,000 payment. Williams agreed, through JERRY B. MANNERY, JR., to be present for the drug transaction in uniform and in his DCPD patrol vehicle.

22. <u>Drug Transaction on January 24, 2013.</u> On January 24, 2013, FBI agents surveilled a drug transaction between Bass and CI-6 in the parking lot of an Ingles store, 4815 Rockbridge Road, Stone Mountain, Georgia. When Bass and CI-6 arrived in the Ingles parking lot, Williams, in his police uniform and driving a DCPD patrol vehicle, parked in the fire lane in front of the store.

Once CI-6 parked his/her vehicle, Bass got into CI-6's vehicle with a backpack. Inside CI-6's vehicle, Bass handed CI-6 the backpack which contained three kilograms of counterfeit cocaine. During this drug transaction, agents observed Williams patrolling the parking lot in his DCPD vehicle. After this drug transaction was completed, Bass left the parking lot. After leaving the parking lot, Bass drove to Dugan's Tavern, 5922 Memorial Drive, Stone Mountain, Georgia, where Bass met with JERRY B. MANNERY, JR.. During this meeting, Bass provided a $6,000 payment to JERRY B. MANNERY, JR.. JERRY B. MANNERY, JR. told Bass that he would immediately give Williams his share of the payment. These transactions were audio and video recorded.

23.     <u>Meeting on January 28, 2013.</u> On January 28, 2013, FBI agents surveilled a meeting between JERRY B. MANNERY, JR., Bass and Williams at an Applebee's Restaurant, 5200 Stone Mountain Highway, Stone Mountain, Georgia. During that meeting, the group discussed the operational aspects of the January 24, 2013 drug transaction and a future drug transaction which was to occur later on January 28, 2013. During this meeting, Williams agreed to protect the future transaction and instructed Bass to remove all cocaine from the scene of the future transaction if Williams shot anyone during that transaction. According to Williams, if other officers were to respond to the scene of shooting and found cocaine present, questions would be asked. Additionally, Williams told Bass that he was off duty that day but would be able to get a DCPD vehicle to use in the drug transaction.

24.     <u>Drug Transaction on January 28, 2013.</u> On January 28, 2013, FBI agents surveilled a drug transaction between JERRY B. MANNERY, JR., Williams, Bass and CI-6 in the parking lot of Value Mall, 5616 Memorial Drive, Stone Mountain, Georgia. When Bass and CI-6 arrived in the parking lot, FBI agents observed Williams, in his police uniform, driving a DCPD patrol vehicle and parked near Bass. JERRY B. MANNERY, JR. was also parked near Bass. Once CI-6 parked his/her

vehicle, Bass got into CI-6's vehicle with a backpack which contained three kilograms of counterfeit cocaine. Inside CI-6's vehicle, Bass handed CI-6 the backpack which contained the counterfeit cocaine. In exchange, CI-6 handed Bass a backpack which contained $6,000. During this drug transaction, agents observed Williams drive his police vehicle closer to Bass's vehicle. After this drug transaction was completed, Bass left the parking lot. Bass drove to a parking lot located at 4570 Memorial Drive, Decatur, Georgia, where Bass met with JERRY B. MANNERY, JR.. During this meeting, Bass provided a $6,000 payment to JERRY B. MANNERY, JR.. JERRY B. MANNERY, JR. told Bass that he would immediately give Williams his share of the payment. These transactions were audio and video recorded.

25.     <u>Meeting on January 30, 2013.</u>  On January 29, 2013, JERRY B. MANNERY, JR. informed Bass that Williams wanted to meet with them to discuss issues related to the January 28, 2013 drug transaction. On January 30, 2013, FBI agents surveilled a meeting between JERRY B. MANNERY, JR., Williams and Bass at an Applebee's Restaurant, 4750 Memorial Drive, Decatur, Georgia. During this meeting, Williams, on duty and in his DCPD uniform, discussed how the group should react if another police officer happened to arrive and interfere with any drug transaction. Williams also suggested that a future drug transaction should take place in a parking lot at a local high school because the timing of an afternoon transaction and the presence of backpacks would not be suspicious. Bass said he would be meeting with a new buyer who was expecting to buy three to four kilograms of cocaine. Williams then explained that he may have to shoot this new buyer if things do not go well, saying "I gotta fuckin' kill him, I can't just shoot him." Williams explained that if a shooting occurred, JERRY B. MANNERY, JR. and Bass should immediately leave the scene. These transactions were audio and video recorded.

26. <u>Drug Transaction on February 1, 2013.</u> On February 1, 2013, FBI agents surveilled a drug transaction between JERRY B. MANNERY, JR., Williams, Bass and CI-2 in the parking lot of Sam's Club, 4705 Memorial Drive, Decatur, Georgia. Williams, in his DCPD uniform, driving a DCPD patrol vehicle, parked in the parking lot. Bass drove into the parking lot and parked directly in front of Williams. Agents also observed JERRY B. MANNERY, JR. in the parking lot. Williams then drove closer to Bass. At that point, CI-2 drove into the parking lot and parked his/her vehicle directly beside Bass. Then Bass got into CI-2's vehicle with a backpack which contained three kilograms of counterfeit cocaine. Inside CI-2's vehicle, Bass handed CI-2 the backpack which contained the counterfeit cocaine. In exchange, CI-2 provided Bass a backpack which contained $6,000. After this drug transaction was completed, Bass left the parking lot. Bass and JERRY B. MANNERY, JR. met at a Publix store, 4422 Hugh Howell Road, Tucker, Georgia. During this meeting, Bass provided the $6,000 payment to JERRY B. MANNERY, JR.. JERRY B. MANNERY, JR. told Bass that he would leave and immediately meet with Williams. These transactions were audio and video recorded.

27. In communications leading up to and through the above-described drug transactions, the drug involved was described to JERRY B. MANNERY, JR. as cocaine.

## CONCLUSION

28. Based on the foregoing, I submit there is probable cause to believe that JERRY B. MANNERY, JR. conspired to commit extortion under color of official right in violation of Title 18, United States Code, Section 1951, and attempted to possess with the intent to distribute cocaine in violation of Title 21, United States Code, Section 841.